UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ERIC MATHISON,<br><br>　　　　　　Defendant. | Case No. 24-cr-10024-IT-6 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

　　For years, Eric Mathison participated in a conspiracy designed for Massachusetts State Police Sergeant Gary Cederquist to obtain thousands of dollars of merchandise from Mathison's employer, Belmont Springs. In exchange, Cederquist – then in charge of MSP's CDL Unit – ensured that certain applicants for Commercial Driver's Licenses (CDLs) connected to Mathison and Belmont Springs would receive passing scores on the CDL skills test. Over the course of the scheme, Mathison delivered truckloads of premium bottled water, boxes of coffee pods and tea, brand-new coffee and drink machines, and candy, like Twizzlers and Swedish Fish, to Cederquist, both at his work trailer at MSP's CDL testing site in Stoughton and at his house. In turn, Cederquist provided passing scores to Belmont Springs CDL applicants, including to applicants who never took an actual test – or who, in some cases, failed it.

　　For the reasons set forth below and to be articulated at the sentencing hearing scheduled for July 17, 2025, the government respectfully submits that a sentence of 24 months of incarceration, three years of supervised release, and the mandatory special assessment of $100 is appropriate in this case and for this defendant. Such a sentence would be sufficient, but not greater than necessary, to satisfy the sentencing objectives enumerated in 18 U.S.C. § 3553(a).

**FACTUAL BACKGROUND**

In his role as a driver at Belmont Springs, Eric Mathison was a frequent flier around MSP's CDL testing site in Stoughton, where Sergeant Gary Cederquist, Trooper Calvin Butner, Trooper Perry Mendes, and others administered CDL skills and road tests to applicants seeking licenses to drive commercial vehicles like tractor-trailer trucks, oil tankers, and school buses.[1] Mathison held a Class B CDL, which enabled him to drive "straight trucks" like many of those utilized by Belmont Springs to deliver water and other products, and he had access to the inventory in Belmont Springs' warehouses in Belmont and Bridgewater. PSR ¶ 24. Mathison became friendly with Sergeant Cederquist, then the head of the CDL Unit in Stoughton, and the two ultimately exchanged at least hundreds of text messages during the course of their relationship. Mathison communicated to Cederquist that his boss at Belmont Springs needed new drivers on the road as quickly as possible, and Cederquist agreed to help. PSR ¶ 45.

From October 2018 to November 2021, Cederquist demanded, and Mathison provided, thousands of items from Belmont Springs' inventory in exchange for preferential treatment on CDL tests, from "cutting the line" to schedule appointments to providing false passing scores for applicants who did not take complete skills tests or who actually failed the test. PSR ¶ 46. Through the duration of their conspiracy, Mathison and Cederquist exchanged at least hundreds of messages in which Mathison and Cederquist texted about (1) CDL applicants and testing, and (2) Belmont Springs inventory for Cederquist. *See* PSR ¶ 24. At Cederquist's trial, which took place from April 14, 2025 to May 2, 2025, these text messages were entered into evidence (many

---

[1] For a more detailed background on CDL testing and MSP's CDL Unit, the government adopts and refers the Court to Paragraphs 10 through 22 of the Presentence Investigation Report ("PSR").

were read aloud) and formed the basis for Cederquist's conviction on Count 4 of the indictment in this case (as well as for other substantive counts).  Exh. A.[2]

In furtherance of the extortion scheme, Mathison drove with applicants to MSP's Stoughton testing site for their "tests," told coworkers that Belmont Springs applicants always have an easy time with their "tests," and served as the formal sponsor for Belmont Springs applicants.  PSR ¶ 48.  At least several drivers whose applications were sponsored by Mathison and whose tests were either administered or supervised by Cederquist actually failed their test but, nevertheless, received a passing score from Cederquist – and, ultimately, their CDL.  PSR ¶ 48.  On at least one occasion, immediately after a Belmont Springs employee took only a partial skills test (for which he later received a passing score and, therefore, a CDL), Mathison loaded a delivery of Belmont Springs products directly into an MSP cruiser.  *Id*.

In their text messages, Cederquist openly remarked about the poor performance of certain Mathison-sponsored applicants, and Mathison likewise joked about various "orders" placed by Cederquist for Belmont Springs products.  *See* PSR ¶ 48; Exh. A at 335-45.  On more than one occasion, Mathison delivered Belmont Springs inventory to Cederquist's residence, also in Stoughton.  *See, e.g.*, Exh. A at 656-61.  On no occasion did Cederquist, or anyone at MSP, pay for the thousands of dollars of Belmont Springs merchandise delivered to the Stoughton CDL testing site or to Cederquist's home.

---

[2] Exhibit A, annexed hereto, is a copy of text messages exchanged between Mathison and Cederquist during the course of their extortion conspiracy – entered into evidence during the *Cederquist* trial as Exhibit 246.  Due to file size constraints, this exhibit cannot be uploaded to the ECF system but will otherwise be delivered to the Court and counsel.

**PROCEDURAL BACKGROUND**

On January 21, 2024, a grand jury returned a 74-count indictment against six defendants, including Mathison. Mathison was charged in Count 4, along with Cederquist, Butner, and Mendes, with Conspiracy to Commit Extortion, in violation of 18 U.S.C. § 1951. On March 21, 2025, the Court held a Rule 11 hearing at which Mathison admitted to his role in the above-described extortion conspiracy and changed his plea to Count 4 of the indictment. Several other defendants subsequently entered guilty pleas, and Cederquist alone proceeded to trial on April 14, 2025. On May 2, 2025, the jury returned a guilty verdict on 48 of the 57 counts with which he was charged, including as to Count 4.

**DISCUSSION**

**I.    Sentencing Guidelines Calculation**

As a preliminary matter, the government concurs with the defendant's offense level, criminal history, and Guidelines Sentencing Range ("GSR") as calculated by the U.S. Probation Office ("Probation") and detailed in the Presentence Investigation Report ("PSR") in this case. Specifically, the government agrees with Probation's assessment of the base offense level (12), pursuant to USSG § 2C1.1(a)(2) and the specific offense characteristic calling for an increase to level 18 because the offense involved a public official in a high-level decision-making or sensitive position, pursuant to USSG § 2C2.2(b)(3). PSR ¶¶ 73-74. Likewise, the government concurs with Probation's offense level decreases for Mathison's acceptance of responsibility pursuant to USSG §§ 3E1.1(a) and 3E1.1(b). PSR ¶¶ 80-81.

As calculated by Probation, the defendant's Total Offense Level is 15 and his Criminal History Category ("CHC") is III, resulting in a GSR of 24-30 months. PSR ¶¶ 82, 106-107, 139. In addition, Probation has computed the Guidelines range for supervised release to be one to

4

three years and the range for a fine to be from $7,500 to $75,000, in addition to a mandatory special assessment of $100. PSR ¶¶ 142, 146-47.

Beyond superficial proposed corrections, neither the government nor Mathison lodged objections to the PSR.

## II.     Sentencing Recommendation

The government's recommended sentence – specifically 24 months of incarceration – is the reasonable and just outcome in a case where the defendant conspired with a sergeant in the State Police and participated in – on virtually a daily basis for years – an extortion scheme designed to put unqualified drivers behind the wheels of huge commercial trucks. And not only did Mathison do this, week in and week out, but he bragged and joked about the scheme and how easy the CDL skills test was for Belmont Springs employees. PSR ¶ 48; Testimony of A. Papandrea, Dkt. No. 242 at 22-23; Exh. A. In short, a meaningful sentence of incarceration – specifically, two years – would accomplish the goals of Section 3553(a) and would be no longer than necessary to do so.

Pursuant to 18 U.S.C. § 3553(a), the Court is required to consider a series of factors when determining an appropriate sentence. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing; "the kinds of sentences available"; the Guidelines range itself; any relevant policy statements by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims." 18 U.S.C. § 3553(a).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Section 3553(a) also mandates that the sentence reflect the seriousness of the offense to, among other

things, promote respect for the law, provide just punishment, adequately deter criminal conduct, and protect the public from further crimes of the defendant. Taken together, the considerations enumerated in Section 3553(a) – in particular, the nature and seriousness of the offense of conviction, the need to promote respect for the law and impose just punishment, and the importance of general and, here, specific deterrence – weigh in favor of a sentence that includes a significant period of incarceration.

### A. The Nature and Circumstances of the Offense Warrant a Sentence of 24 Months

First, the Court must consider the nature, circumstances, and seriousness of the offense, combined with the need for a sentence to promote respect for the law and provide just punishment. 18 U.S.C. §§ 3553(a)(1) and 3553(a)(2)(A). Here, in light of the scope, the substance, and the manner in which Mathison comported himself with respect to his conduct, the government submits that the nature, circumstances, and seriousness of the offense warrant a sentence of 24 months of incarceration.

As an initial matter, the sheer quantity of Belmont Springs inventory and individual deliveries comprising the stream of benefits Mathison provided to Cederquist distinguishes him in this case. As his text messages with Cederquist demonstrate, he was communicating about deliveries of Belmont Springs products – in other words, his role in the extortion conspiracy – week in and week out: hundreds of these texts were introduced at Cederquist's trial and provided uncanny insight into the nature of the extortion scheme. *See* Exh. A. Photos of deliveries Mathison placed inside Cederquist's trailer at MSP's Stoughton testing site, also introduced during Cederquist's trial, likewise speak volumes about the nature of Mathison's conduct:



Apart from the number of individual items, the total value of the inventory delivered by Mathison over the course of the conspiracy rises to a significant amount, despite being "just water" or "just candy." By a conservative estimate, and relying only on photos of deliveries sent by Mathison to Cederquist and text messages describing specific deliveries, the total value of Belmont Springs inventory provided by Mathison to Cederquist is over $8,300. *See* Exh. B.

Amplifying the nature of his criminal conduct and the need for a serious sentence, Mathison talked about aspects of the scheme – and enacted it – openly and casually and treated it – that is, an extortion conspiracy involving a sergeant in the Massachusetts State Police and jeopardizing public safety – as if it was all a big joke. As testimony at Cederquist's trial and his own text messages reveal, Mathison bragged to his coworkers and regularly joked about it all with Cederquist. As one example, former Belmont Springs employee Anthony Papandrea told the jury at Cederquist's trial, "[Mathison] said it would be easier for us to pass the test because he knew the people that administered the test." Dkt. No. 242 at 23. During one CDL skills test of a Mathison-connected applicant, Cederquist texted, "This kid's an idiot"; "No idea what he's doing"; and "Dan [Mathison's boss] should be sending strippers," along with different emojis.

7

Mathison responded, "I fuc[k]ing love the emojis ha ha."  Exh. A at 335-37.  Mathison referred in texts with Cederquist to Voss, a premium brand of bottled water, as "Norway" (where the water is bottled) and regularly joked about how much his boss "owed" Cederquist for what Cederquist was doing for Belmont Springs employees.  *See* Exh. A.

Indeed, Mathison's conduct was so flagrant that members of the CDL Unit actually gave Mathison a key to the locked gate at the Stoughton MSP testing site, which Mathison utilized to make deliveries after hours.  Regarding an apparent delivery of tea, espresso, Twizzlers, and Swedish Fish, Cederquist asked, "You have a key to the gate now, right?"  Mathison responded, "Yes, I have a key to the gate."  Exh. A at 103.  Later that day, Mathison texted Cederquist a photo of his delivery of Belmont Springs products inside Cederquist's trailer at the Stoughton testing site, along with the messages, "All stocked up" and "Not bad. Not bad at all ha ha".  Exh. A at 105.

To be sure, the government acknowledges that no defendant in this case is as culpable as Sergeant Cederquist: Cederquist ran the CDL Unit in Stoughton, supervised every other participant in the scheme, and drove the extortion conspiracy.  To that end, the government expects its sentencing recommendations for the defendants to reflect exactly that.  However, the conduct of the other participants, including Mathison, demonstrates a blatant disregard for the law and, more egregiously, a callous indifference for the safety of everyone on the roads and highways of Massachusetts.  Mathison's years-long, repetitive conduct, combined with his criminal history (as discussed in more detail below), warrants the two-year sentence the government requests.

### B. General Deterrence Mandates a Significant Sentence

Pursuant to 18 U.S.C. § 3553(a)(2)(B), the Court also must consider the need for the sentence to afford adequate general and/or specific deterrence to criminal conduct. Here, the government submits that the Court should be concerned with both. First, with respect to general deterrence, the evidence introduced throughout Cederquist's trial demonstrates the diverse avenues through which members of law enforcement and people close to members of law enforcement can devise and execute schemes to provide benefits only to certain people with the "right" connections. In some instances in this case, the corrupt conduct seemed to originate exclusively because of personal or professional relationships with Cederquist or another member of the CDL Unit; in Mathison's example, the relationship was secondary to the base exchange of Belmont Springs inventory for passing scores.

Particularly in the shadow of recent police corruption scandals in Massachusetts, the conduct exposed in this case underscores the need for this Court to impose a sentence that takes general deterrence into account and sends a message that this type of criminal conduct will not be tolerated. A sentence that includes a meaningful period of incarceration is necessary to deter others similarly situated who might be tempted to engage in the same course of conduct. A sentence without a substantial period of incarceration would not accomplish this goal. The government submits that a sentence of 24 months of imprisonment will serve to generally deter others from contemplating or engaging in such crimes.

### C. Mathison's Criminal History Weighs in Favor of a Significant Sentence

Unlike his co-defendants, Mathison has a serious criminal history, including, among other things, a variety of arrests and convictions relating to the impersonation of police officers. PSR ¶¶ 85, 87, 89, 97, 99-105. The government acknowledges that many of these offenses took

9

place years ago, when he was a young adult, though the nature of the conduct and his repeat offenses – especially those that involve impersonating members of law enforcement by dressing up in police garb, wearing a police belt, and driving vehicles outfitted with police lights – may provide insight into his potential for recidivism. As a result of convictions in 2008 for robbery, assault and battery, and "falsely assuming to be a police officer," Mathison was sentenced to eight years in state prison, with several sentences for other convictions running concurrently. As a result, Mathison's record is reflected in a Criminal History Category of III, elevating his Guidelines range to 24-30 months.[3]

Thus, a 24-month sentence is also necessary to deter Mathison from reoffending upon his release from custody. This is not a case in which the defendant committed one bad act for the first time or where he happened to be caught crossing the line on his worst day. This case did not involve a mistake or momentary lapse in judgment. Rather, he engaged in criminal conduct over and over again, taking inventory from Belmont Springs, arranging with Cederquist to make deliveries to MSP's testing site (and to Cederquist's house), and knowingly facilitating the issuance of CDLs to applicants who had never taken and passed the required skills test.

## CONCLUSION

For all of the foregoing reasons, the government respectfully recommends that the Court impose a sentence of 24 months of imprisonment, three years of supervised release, and the

---

[3] Had Mathison's Criminal History Category been I, like his co-defendants, his GSR would have been 18-24 months.

mandatory special assessment of $100. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Date: July 10, 2025          By:   /s/ *Adam W. Deitch*
                                   CHRISTINE WICHERS
                                   ADAM W. DEITCH
                                   Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

      Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                                   */s/ Adam W. Deitch*
                                                    Adam W. Deitch
                                                    Assistant United States Attorney

Dated:  July 10, 2025